THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPHSIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF )<br>)<br>(1) THE PROPERY LOCATED AT 725 UNION )<br>STREET, APARTMENT 2, MANCHESTER, )<br>NEW HAMPSHIRE; AND )<br>)<br>(2) 2016 GREY LANDROVER, NH REG. )<br>4464612, REGISTERED TO KERMIT CEASAR ) | DOCKET NO. 21-mj-294-AJ-01 |

### AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANTs

I, Task Force Officer Michael McGee, being first duly sworn, state under oath as follows:

Introduction

1. The following affidavit is furnished to support a search warrant for the following locations: The property located at 725 Union Street, Apartment 2, Manchester, New Hampshire (The Union Street Apartment) and a 2016 Grey Land Rover, NH Reg. 4464612, registered to Kermit Ceasar (The Land Rover). A detailed property description for the apartment is contained in Attachment A and a description of the vehicle is contained in Attachment B.

2. Based on the facts and circumstances contained in this affidavit, I submit that there is probable cause to believe that KERMIT CEASAR and others known and unknown are engaged in drug trafficking activities that constitute violations of. 21 U.S.C. § 841(a)(1) (distribution of controlled substances). I further submit that there is probable to search the residence located at the Union Street Apartment and the Land Rover for evidence of these drug distribution offenses.

3. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to

conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.  I also am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

4. I am employed as a police officer with the Manchester, New Hampshire Police Department and have been so since July 2014.  I am currently assigned to the Federal Bureau of Investigation's (FBI) New Hampshire Safe Streets Gang Task Force, which works to dismantle and disrupt criminal organizations and streets gangs in and around the state of New Hampshire. I have been assigned to this task force since March of 2021. Prior to joining the task force, I was assigned to Manchester Police Department's Anti-Crime Unit where I focused on the deterrence and apprehension of violent offenders with a special emphasis on criminal street gangs. I was assigned to the Anti-Crime Unit between November 2021 and March 2021.  Prior to joining the Anti-Crime Unit, I was assigned to the Gang Prevention Unit where I strictly focused on criminal street gangs within Manchester. My duties within the Gang Prevention Unit consisted of apprehension, deterrence, and intervention of individuals associated with criminal street gangs. I was assigned to the Gang Prevention Unit in June 2017.

5. During my employment as a police officer, I have successfully completed the Manchester Police In-House Academy as well as the New Hampshire Police Standards and Training Council Academy located in Concord, New Hampshire.  I have received specialized investigatory training in numerous areas to include, gang investigations, drug investigations, criminal interdiction, and I am a certified Professional Gang Investigator by the East Coast Gang Investigators Association.  I have responded to, investigated, or participated in the investigation of many crimes to include homicides, aggravated assaults, robberies, burglaries, thefts, and drug related crimes.  I have a Bachelor of Arts in Criminal Justice from Saint Anselm College in

Manchester, New Hampshire.  In my current assignment I have tracked, interviewed, investigated, and otherwise spoken with several persons involved with gangs, violent crimes, and drug trafficking.

6. Based on my training and experience, I am familiar with the manner and means commonly employed by drug traffickers and drug trafficking organizations to conduct their illegal activities, including purchasing, manufacturing, storing, and distributing controlled substances, the laundering of illegal proceeds, and the efforts of persons involved in such activities to avoid detection by law enforcement.  I am also familiar with the terminology and slang commonly employed by drug traffickers.  I have observed and examined cocaine, cocaine base ("crack"), heroin, and fentanyl as well as other controlled substances.  I am aware of the street prices for these substances, the methods of packaging, and the jargon used in the drug trade. I am also familiar with drug traffickers' methods of operation, including the distribution, storage, and transportation of drugs and the collection of money that constitutes the proceeds of drug trafficking activities.[1]  I am familiar with the types of packaging used to distribute controlled substances as well as equipment used such as scales, bags, pill presses and cutting agents. I am also familiar with drug-related paraphernalia and the equipment used to ingest controlled substances, such as syringes and smoking pipes.  I have talked to drug dealers and listened to their conversations, so I am familiar with the coded language often used in these conversations.  Because of my training and experience, I am familiar with new trends of concealing illegal drug trafficking. I also stay current on the latest technology used to investigate drug crimes. In sum, through my training, education, and experience, I have become familiar

---

[1] Observations made and conclusions drawn throughout this declaration that are based on my training and experience also include the training and experience of other law enforcement agents and officers with whom I have discussed these issues.

generally with the manner in which drug traffickers conduct their illegal activities, including purchasing, manufacturing, storing, and distributing drugs, the laundering of illegal proceeds, and the efforts of persons involved in such activities to avoid detection by law enforcement.

7. I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports given to me by other agents, task force officers, and members of law enforcement. Since this affidavit is being submitted for the limited purpose of establishing that probable cause exists to support the issuance of a search warrant for the Union Street Residence and the Land Rover, I have not included details about every aspect of the investigation. While this affidavit contains all the material information I am aware of that is pertinent to the requested search warrant, it does not set forth all of my knowledge about this matter.

## Probable Cause

7. On November 1, 2021, a grand jury sitting in the District of New Hampshire indicted Kermit Ceasar on six counts of drug distribution on the following dates:  April 22, 2021, May 19, 2021, June 8, 2021, June 23, 2021, July 20, 2021, and August 23, 2021.  The transactions were all conducted with the same confidential informant.  Each transaction was audio and video recorded and observed by members of the Manchester Police Department.  On April 22, 2021 and May 19, 2021, Ceasar was observed coming and going from the charged drug transaction in the Land Rover.  Throughout these transactions, Ceasar used multiple cellular telephones to communicate with the confidential informant about the drug transactions.

8. On November 18, 2021, the FBI and Manchester Police executed the arrest warrant issued by this Court following Ceasar's November 1 indictment. Based on prior

surveillance and intelligent law enforcement believed that Ceasar resided at the Union Street Apartment.

9. At approximately, 6:34 am, law enforcement observed Ceasar exit the door of the Union Street Apartment building. Ceasar walked north on Union Street and then east on Brook Street toward where he parks his Land Rover on Walnut Street. Ceasar was arrested by Manchester Police officers while walking on Brook Street. Surveillance of Ceasar was continuous from the time that he exited the Union Street Apartment building.

10. On Ceasar's arrest, Manchester Police officers searched Ceasar incident to his arrest. In Ceasar's underwear, the police located two bags containing an off white rock-like substance that appeared to be crack cocaine. The substance was field tested; it tested positive for crack cocaine and weighed approximately 8.5 grams. In addition, law enforcement seized from Ceasar to black I-phones one with an Otterbox case and the other with a U-Maker case.

11. Following the arrest, Manchester Sergeant Eric Joyal conducted a knock and talk interview at 725 Union Street, Apartment 2. Sergeant Joyal spoke to Joseph Alston. Joyal recognized Alston as the person who acted as a runner for Ceasar on a controlled sale of crack cocaine with the confidential informant that occurred on September 24, 2021.[2] Alston said that he was staying at this apartment with his friend, "Kermit." The landlord of the building, John Ploss, also told the Manchester Police that Ceasar lived in Union Street, Apartment 2.

12. After the knock and talk, Manchester Police brought a certified drug-sniffing canine to the Land Rover. The dog proceeded around the exterior of the car and alerted on the rear passenger door toward the quarter panel

---

[2] This deal was not charged in the indictment because lab analysis of the seized drugs was not yet complete when the case was indicted.

Training and Experience Concerning Items to be Seize

13. Based upon my training and experience, as well as the collective knowledge and experience of other agents and police officers who participated in this investigation, I am aware that drug traffickers often store controlled substances and other tools of the drug trade in their homes and vehicles. I am aware that it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia including, but not limited to, scales, plastic baggies, wrapping material, paper or plastic bundles, and zip lock bags, in residences or other vehicles that they access with frequency.

14. It is a common practice for drug traffickers to maintain in hard copy or on electronic devices, records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand to readily ascertain current balances.

15. Drug traffickers will commonly maintain records and documents which provide a paper trail for money laundering of illicit drug trafficking proceeds, often long after the actual transactions. There are many reasons why an individual will generally maintain records for long periods of time. One reason is that the records will often seem innocuous because of their nature (e.g. financial, credit card and banking documents, travel documents, receipts, client lists, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes, packaging materials, computer hardware and software). Second, the individual may no longer

realize he/she still possesses the records or may believe law enforcement could not obtain a search warrant to seize the evidence. Lastly, it is common for individuals to set aside or store such records, and because they generally have no immediate need for the records, they are often forgotten. To law enforcement, however, all these items may have significance and relevance when considered with other evidence.

16.    Additionally, drug traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available to efficiently conduct their drug trafficking business. Drug traffickers may also keep lists of customers, the cars they drive, and the phones they use to keep track of them. They may also collect court papers and other documents about customers who they believe may be cooperating with law enforcement authorities to protect themselves or attempt to intimidate potential cooperators.

17.    It is also a common practice for traffickers to conceal at their residences and in vehicles large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. Individuals who distribute controlled substances often use cash or readily transported assets which are used as cash equivalents like pre-paid debit cards, gift cards, bearer bonds, gold, diamonds, or jewels because of the illegal nature of the transactions and to lessen the possibility of a financial paper trail. Additionally, drug traffickers typically use wire transfers, cashier's checks, and money orders to pay for controlled substances. They may also use banks and wire companies, both foreign or domestic, to launder and transfer funds to co-conspirators. They may further use shipping companies and keep records of shipments of goods bought with drug proceeds. Records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences and vehicles.

18. Based on my training and experience, I know that individuals involved in the distribution of controlled substances attempt to hide the true identity of their residence and employ methods of surveillance at such residence in order to evade law enforcement. Typically, these individuals will maintain at their residence documents relating to the identity of the person(s) in residence, occupancy, control, or ownership of the subject premises. Identification documents may help to clarify the identity of people in the residences who have access to the items found in the residences. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

19. Based on my training and experience, I know that drug traffickers typically use cellular telephones to facilitate drug transactions, including to order and take orders for controlled substances or to set up shipments. I am aware that items such as cell phones and United States currency are often located in a residence or in a vehicle.

20. Individuals involved in the illicit distribution of controlled substances often take or cause to be taken photographs of themselves, their associates, their property and their product and such items are usually maintained within their residence and sometimes on cell phones or computers.

21. It is common for individuals who are involved in the trafficking and distribution of controlled substances to store the records of those activities and proceeds of those activities in secure areas over which they have control such as safes, bags, locked drawers, briefcases, and duffel bags, among other locked containers.

Training and Experience on Digital Devices

22. In addition to documentary evidence of financial and drug trafficking crimes, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and many of these cellular telephones are kept at the dealers' own residence or in vehicles. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants of residences or vehicles that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained and contained evidence of the crimes under investigation.

23. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages. Actions such as internet searching or emailing (in addition to calling) and text messaging can now be performed from many cell phones.

24. In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case such as this, where investigators have analyzed telephone toll records involving the

interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

25.     Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

26.     As with most electronic/digital technology items, communications made from an electronic device, such a cell phone, are often saved or stored on the device.   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

   a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law-enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. The volume of data stored on many digital devices will typically be so large that it will be impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500-gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually

disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable

from the hard drive image. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about when the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to

demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment and can require substantial time.

## Conclusion

27. For all the reasons described above, I submit that there is probable cause to believe that evidence and fruits of the violations of Title 21, United States Code, Section 841(a)(1) will be found by searching the locations described in the Attachment A and B. Based upon my training and experience, I believe that the items set forth in the Attachments C are commonly possessed by drug traffickers in their homes and vehicles, and on their cell phones and that those items are evidence of violations of the offenses being committed by CEASAR and others.

I declare that the foregoing is true and correct.

/s/ Michael McGee
Michael McGee, Task Force Officer
FBI, Task Force Officer

The affiant appeared before me by telephonic conference on this 18th day of November, 2021 pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application

_Andrea K. Johnstone_
HON. ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF NEW HAMPSHIRE

**ATTACHMENT B**
**2016 Land Rover, N.H. Reg. 4464612**

This search warrant authorizes the search of the vehicle described as a Grey 2016 Land Rover, N.H. Reg. 4464612, registered to Kermit Ceasar with VIN SALGS2VF5GA283803.

**ATTACHMENT C**
**Items to be Seized**

1. Controlled substances;

2. Drug distribution paraphernalia including, but not limited to: scales; plastic baggies; wrapping material; paper or plastic bundles; blenders; zip lock bags; presses; cutting agents; and pill presses;

3. Electronic equipment used for counter-surveillance such as scanners, police radios or monitors, surveillance cameras and monitors and devices used to store surveillance footage, anti-bugging devices and devices used to detect the presence of wiretaps, recording devices or transmitters, and/or receipts or literature describing same;

4. Documents associated with drug trafficking including pay-owe sheets, buyer lists, seller lists, ledgers, records of sales, records of expenditures made to purchase drugs or chemicals and apparatus used to manufacture drugs, buyer lists, telephone lists, address books (written or electronic/digital media).

5. Large amounts of currency (exceeding $1,000) or readily transported assets which are used as cash equivalents (cashiers' checks, bearer bonds, gold, diamonds, precious jewels, etc.); prepaid debit cards and gift cards;

6. Materials showing the receipt of large amounts of cash including bank statements and related records, passbooks, letters of credit, money drafts, cashier's checks, bank checks, checkbooks, tax returns, loan statements, tax return work papers, escrow files, Forms 1099, wire transfer records, and other items evidencing the obtaining, secreting, transfer, concealment, and expenditure of money related to drug trafficking activities;

7. Bank and other financial institution records, showing acquisition, conversion, movement, secreting, transfer and disbursement of United States and foreign currency from 2020 to the present;

8. Materials evidencing expenditure of drug trafficking proceeds including, purchase of large assets, including digital image storage devices, records of real estate or securities transactions, escrow files, wire transfer records, automobiles, motorcycles, trucks, or other vehicles purchased with cash or cash equivalents; credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

9. Photographs, negatives, video tapes, films, depicting the subjects of the investigation and their criminal associates, (showing association with the associates, depicting their assets or depicting controlled dangerous substances);

10. Personal calendars, address and/or telephone books, rolodex indices and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers, correspondences of the subjects of the investigation and their criminal associates, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

11. Indicia of possession of the place to be searched: including articles of personal property, such as personal identification, immigration documents, personal correspondence, delivery pouches, diaries, checkbooks, notes, photographs, keys, utility bills, receipts, personal telephone and address books, and video tapes, tending to establish the identity of the person or persons in control of the areas to be searched;

12. Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes and work papers concerning CEASAR'

13. Keys to show ownership for storage facilities, businesses, locked containers, cabinets, safes, safe deposit boxes, conveyances and/or other residences.

14. Cellular telephones. This search warrant authorizes the search of those telephones (including the two I-phones seized from Ceasar incident to his arrest) for:

   a. Information associated with drug trafficking, including pay-owe sheets, buyer lists, telephone lists, address books, seller lists, ledgers, records of sales, records of expenditures made to purchase controlled substances, and records of expenditures to purchase products which are used in the distribution of controlled substances;

   b. lists of customers and related identifying information;

   c. types, amounts, and prices of controlled substances trafficked as well as dates, places, and amounts of specific transactions;

   d. any information related to sources of controlled substances (including names, addresses, phone numbers, or any other identifying information);

   e. any information involving the travel to obtain controlled substances or the transportation of controlled substances;

   f. information reflecting contact or communication with coconspirators, the distribution of controlled substances to coconspirators, and the disposition of proceeds of controlled substances (including within messaging applications like WhatsApp, Snapchat, and Instagram stored on the phone);

   g. all bank records, checks, credit card bills, account information, and other financial records;

      h.  Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.